UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

Claude Thomas,

                    Plaintiff,              CV-03-1797 (CPS)

     - against -                            MEMORANDUM OPINION
                                            AND ORDER
The City of New York, Bendiner and
Schlesinger, Quest Diagnostics
Incorporated, Laboratory Corporation
of America Holdings, and
Kerry Kelly, M.D.

                    Defendants.

----------------------------------X

SIFTON, Senior Judge.


    Plaintiff Claude Thomas ("Thomas"), a former firefighter

with the New York City Fire Department ("NYFD"), commenced this

action against defendants City of New York ("City") and Kerry

Kelly, M.D. ("Dr. Kelly"), alleging that defendants conspired to

deprive him of rights under the Department of Transportation drug

testing regulations[1], based on his race, violating his due

process and equal protection rights, and discriminating against

_____

    [1] In 1991, Congress passed the Federal Omnibus Transportation Employee
Testing Act of 1991 ("FOTETA"), which, among other things, amended the Federal
Aviation Act, Federal Railroad Safety Act, and Commercial Motor Vehicle Safety
Act to require drug testing for transportation employees in safety sensitive
positions. *See* Federal Omnibus Transportation Employee Testing Act of 1991,
Pub. L. No. 102-143, 105 Stat. 952 (1992). FOTETA requires mandatory pre-
employment, reasonable suspicion, post-accident, and random drug testing of
covered aviation, railway, commercial motor carrier, and mass transit
transportation workers. *Id.* FOTETA and the Department of Transportation
("DOT") regulations promulgated pursuant to FOTETA apply to "transportation
employers, safety-sensitive transportation employees (including self-employed
individuals, contractors and volunteers as covered by DOT agency regulations),
and service agents." *Id*; 49 C.F.R. Part 40.1.

him on the basis of disability.  Plaintiff also alleged RICO

claims under 18 U.S.C. § 1962, Title VII claims of race

discrimination and retaliation against the City of New York under

42 U.S.C. §§ 2000e to 2000e-17 and 42 U.S.C. §§ 1981, 1983, and

1985, and disability discrimination claims under the Americans

with Disabilities Act, 42 U.S.C. § 12101 *et seq* and Section 504

of the Rehabilitation Act, 29 U.S.C. § 794.[2]  The litigation

---

[2] Plaintiff filed his original complaint in this action on April 14, 2003, naming seven defendants: the City of New York, the New York City Fire Department ("FDNY"), Dr. Kelly, three laboratories (Bendiner and Schlesinger, Quest Diagnostics Incorporated, and Laboratory Corporation of America Holdings), and the Uniform Firefighters Association ("UFA").  In an order dated April 1, 2004, I dismissed plaintiff's claims with leave to replead.  In addition, I dismissed FDNY as a party to the suit since FDNY lacks the capacity to be sued under New York City Charter § 396, and construed all claims against FDNY as claims against the City of New York. I dismissed with prejudice plaintiff's procedural due process claim under Section 1983 and plaintiff's disability discrimination claims against Dr. Kelly.

Plaintiff mailed a Second Amended Complaint to all defendants on May 28, 2004.  Plaintiff filed a different version of the Second Amended Complaint on June 1, 2004.  On June 21, 2004, a telephone conference between all parties was conducted by Magistrate Judge Gold to address confusion on the part of the defendants as to which of the two amended complaints to answer.  At that conference, Magistrate Judge Gold directed plaintiff to serve and file a Third Amended Complaint (in lieu of the two prior amended pleadings) on or before July 8, 2004.

Plaintiff served copies of the Third Amended Complaint on defendants by electronic mail on July 8, 2004, and mailed copies to all defendants on July 9, 2004.  Defendant Bendiner and Schlesinger, however, apparently did not receive a copy of the complaint until July 13, 2004.  Plaintiff did not file the Third Amended Complaint electronically.  In addition, while a copy of the Third Amended Complaint was filed with the Clerk of Court on July 12, 2004, plaintiff failed to include the last two pages of the complaint, including the signature page.  Plaintiff did not replead any claims against the UFA, nor did plaintiff replead a RICO claim in the Third Amended Complaint.  Plaintiff alleged discrimination claims under Article 15 of the New York State Human Rights Law, New York Executive Law § 290.

In a Memorandum and Opinion dated November 18, 2004, I dismissed all Section 1985 claims and all claims against the three laboratories originally named as defendants.  I dismissed all Section 1983 claims except plaintiff's claims that the City deprived him of his liberty interest without due process, violated 40 C.F.R. Part 40, and violated his equal protection rights.  I also dismissed all claims against Dr. Kelly except a claim arising under 42 U.S.C. § 1981.

Plaintiff's remaining claims against the City of New York arise under Title VII, Section 1983 (due process and equal protection), the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, Section 1981, and

-3-

arises out of the NYFD's termination of plaintiff's employment
based on a urinalysis that was positive for the presence of a
controlled substance.  Presently before the Court are plaintiff's
and defendants' cross-motions for summary judgment pursuant to
Federal Rule of Civil Procedure 56.  For the reasons set forth
below, summary judgment is granted in favor of all of the
remaining defendants.

## Background

The facts are drawn from the Third Amended Complaint,
previous decisions in this case, defendant City's Rule 56.1
Statement[3], and the parties' submissions in connection with these

---

New York State Human Rights Law, New York Executive Law § 290 (age, race, and
disability discrimination). Plaintiff also retains a Section 1981 claim
against defendant Dr. Kelly.

[3] Plaintiff has failed to comply with Local Civil Rule 56.1 since he has
not submitted with his motion "a separate, short and concise statement, in
numbered paragraphs, of the material facts as to which the moving party
contends there is no genuine issue to be tried." Because "[f]ailure to submit
such a statement may constitute grounds for denial of the motion," *id.*,
defendants argue that plaintiff's motion should be dismissed on this ground
alone.  In addition, plaintiff has alleged facts elsewhere in his submissions
that have not been "followed by citation to evidence which would be
admissible."  *See* Local Civil Rule 56.1(e).
     Generally, courts are lenient regarding compliance with Rule 56 when the
plaintiff is proceeding *pro se*, *Govan v. Campbell*, 289 F.Supp.2d 289, 295
(N.D.N.Y. 2003), but in this case, plaintiff is represented by counsel.
Because "[t]he preference of courts in this Circuit is for decisions on the
merits," Memorandum and Opinion, Nov. 18, 2004, No. 03-1797 (CPS), p. 14, I
will not deny plaintiff's motion solely on the basis of his failure to submit
a Rule 56.1 statement.  Instead, in keeping with the purposes of Local Civil
Rule 56.1, I will consider defendants' statement of facts as admitted.  *See
Spina v. Our Lady of Mercy Medical Center*, 2003 WL 22434143, at *2 (S.D.N.Y.
2003) (considering defendant's facts admitted and pointing out that summary
judgment rules, particularly Rule 56.1 "were adopted for a reason - 'to supply
the court with an accurate factual record and to prohibit parties from taking
misleading and unfair "shortcuts"'" (quoting *Omnipoint Communications, Inc.
v. White Plains*, 175 F.Supp.2d 697, 700 (S.D.N.Y. 2001); *see also Holtz v.*

motions.  Disputes are noted.

Plaintiff, an African-American male, joined the New York
City Fire Department on November 12, 1989 as a Firefighter First
Grade.  On July 21, 1999, plaintiff signed a Stipulation and
Agreement ("Stipulation") with the FDNY in which plaintiff
admitted to the use of a controlled substance on May 24, 1999,
leaving the scene of an accident on June 7, 1999, and violating
the FDNY's Oath of Office.  The Stipulation provided that
plaintiff would in the future be subject to frequent random
testing for controlled substances.

After signing the Stipulation, plaintiff says he was subject
to verbal abuse from commanding officers in the presence of co-
workers and others.  One such incident allegedly occurred on
November 15, 1999.  A Captain Blume is said to have yelled at
plaintiff, using expletives, for not moving quickly enough when
ordered upstairs.  In the presence of a Bureau of Investigation
and Trials ("BIT") officer, Captain Bloom allegedly "placed his
index finger on plaintiff's cheek and screamed in plaintiff's
face "Mother f....r, who do you think you are?  When I give you a
f...ing order, you better listen boy, you f...ing a..hole."
(Comp. ¶ 42.)  Captain Blume suspended plaintiff for 30 days
without pay and according to the Complaint, said to plaintiff as

---

*Rockefeller and Co., Inc.,* 258 F.3d 62, 74 (2d Cir. 2001); *Loucar v. Bostom
Market Corporation*, 294 F.Supp.2d 472, 478 (S.D.N.Y. 2003).

plaintiff was changing into civilian clothes, "we got you nigger." (Comp. ¶¶ 48-49).

Plaintiff returned to the firehouse from his suspension on December 17, 1999 and was immediately suspended for another 30 days by Captain Blume for allegedly not turning the volume down on the television quickly enough when ordered to do so. Plaintiff, suffering severe chest pains as a result of the confrontation, was removed from the fire house by Emergency Medical Services. Plaintiff was, at the time, taking anti-depressant medication and was being treated by Dr. Richard G. Dudley, Jr., a psychiatrist, for job-related stress. Dr. Dudley subsequently submitted a letter to the FDNY, dated February 14, 2000, requesting medical leave on behalf of plaintiff, which was denied. Dr. Dudley renewed the request by letter dated March 7, 2000, which was again denied. On January 24, 2000 plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").

Plaintiff's urine was tested for drugs approximately 29 times between July 21, 1999 and October 24, 2002, with negative results each time. Generally, the urine specimens were split into two, a "primary" specimen and a "split" specimen.[4] Pursuant

---

[4]A primary specimen is "the urine specimen bottle that is opened and tested by a first laboratory to determine whether the employee has a drug or drug metabolite in his or her system." 49 C.F.R. § 40.3. The split specimen is that "part of the urine specimen that is sent to a first laboratory and retained unopened, and which is transported to a second laboratory in the event that the employee requests that it be tested following a verified

to a contractual agreement with the FDNY, plaintiff's October 24, 2002 urine sample, like all the previous samples, was first tested by the laboratory, Bendiner and Schlesinger ("B & S"). The October 24, 2002 urine specimen tested positive for morphine at 1353 ng/mL (nanograms per milliliter). The FDNY specifies a 300 ng/mL cutoff level for opiates, including morphine.[5] As a result of the positive report, plaintiff was ordered to "stand down" on November 4, 2002, meaning that he was restricted from driving department vehicles and treating injuries.

On November 5, 2002, plaintiff submitted a hair follicle and urine sample to his treating physician, Dr. Dudley, for testing. According to Dr. Dudley's letter to the FDNY, a hair drug screen can determine if a person ingested opiates at any point in time over a period from weeks to years prior to the sample being taken. Both hair and urine samples were tested by Quest Diagnostics, Inc. ("Quest"), a laboratory on the FDNY's list of approved laboratories. The urine tested negative, and according to Dr. Dudley, the hair follicle test was also negative for opiates. Dr. Dudley reported the results to the FDNY on November 14, 2002.

By letter dated November 6, 2002, plaintiff was informed by

_____

positive test of the primary specimen or a verified adulterated or substituted test result." *Id.*

[5] The DOT regulations for "safety sensitive positions" specifies a 2000 ng/mL cutoff concentration level for morphine in 49 C.F.R. § 40.87.

the FDNY that as a result of the October 24, 2000 positive result
and pursuant to the Stipulation, he had seven days to submit a
re-test request and present relevant evidence on his behalf
before the FDNY took final action. The letter also indicated
that failure to provide "satisfactory and acceptable mitigation"
would result in plaintiff's termination on November 21, 2002.

On November 11, 2002, plaintiff submitted another urine
sample to a BIT Lieutenant at the Bureau of Health Services, but
never received the results from its testing.

On November 14, plaintiff paid a $108 fee to have his
October 24, 2002 specimen re-tested. In a letter dated November
13, 2002 to Quest, Dr. Kelly, the FDNY Chief Medical Review
Officer, requested a re-test of plaintiff's specimen for a
confirmation of morphine. At an unknown date, Assistant
Commissioner James Drury, on behalf of BIT, sent a urine
specimen, attributed to plaintiff, to Quest for a re-test. The
request was copied to B & S. A third letter, also undated, was
sent from B & S to Quest requesting plaintiff's urine be re-
tested for morphine. Which specimen each request relates to and
what became of both the primary specimen and the split specimen
from B & S is not clear.

Plaintiff alleges that the primary specimen of plaintiff's
urine was removed from frozen storage at B & S on November 22,
2002, but it was not sent to Quest for re-testing until three

days later on November 25, 2002. Plaintiff alleges that B & S
failed to properly refrigerate the specimen in this interval.
(Compl. ¶ 91). The specimen was not received by Quest until
December 2, 2003. Plaintiff alleges that the specimen container
was broken and not intact upon arrival at Quest. (Compl. ¶93).
According to plaintiff's complaint, a December 3, 2002 report
from Quest indicates the re-test of the primary specimen revealed
morphine levels of 200 ng/mL, below both the FDNY and DOT cutoff
levels.

On November 13, 2002, plaintiff was suspended for 30 days
because of the initial positive morphine test of his October 24,
2002 urine specimen. On November 15, 2002, the New York Fire
Department published plaintiff's suspension for violating
sections of the Regulations for the Uniformed Force governing the
use of controlled substances and the oath of office. By letter
dated December 4, 2002, plaintiff was notified that he was
terminated, effective December 14, 2002. Immediately upon the
notification of his suspension and again upon the notification of
his termination, plaintiff, denying the use of any controlled
substance other than Zoloft, contacted Robert Straub, the Bronx
Trustee of the UFA, requesting that he file a grievance on
plaintiff's behalf. Plaintiff alleges that no grievance was
filed.

On December 24, 2002, plaintiff advised Deputy Commissioner

Clinton that he wanted the urine specimens from B & S and Quest to be re-tested to confirm the existence of morphine and to determine their DNA. On December 31, 2002, plaintiff executed an authorization for the transfer of specimens from Quest to LabCorp, also on the FDNY list of approved laboratories. On January 2, 2003, plaintiff paid $1500 to LabCorp for the tests. However, on the same date, plaintiff was advised by Susan Mills of Quest that the specimen could not be transferred without FDNY authorization. On January 6, 2003, Quest obtained a mouth swab from plaintiff in Queens for the purpose of determining his DNA characteristics to be transported to LabCorp. (Compl. ¶142). On January 27, 2003, LabCorp reported that it had not received the urine specimen from Quest, apparently because the specimen was shipped from Quest without being appropriately addressed. The specimen was later found on January 31, 2003.[6] Plaintiff alleges that Ms. Mills of Quest, acting under instructions from the FDNY, only authorized a test for a morphine confirmation. On February 6, 2003, Dr. Kelly transmitted a letter to LabCorp authorizing the DNA testing. Plaintiff was required to pay an additional $90 fee to LabCorp. LabCorp did not report its findings with respect to the morphine test, but by letter dated March 10, 2003, LabCorp

---

[6] The amended complaint is unclear as to who allegedly lost the specimen. While plaintiff seems to allege on the one hand that LabCorp lost the urine specimen (Third Amended Complaint ¶152), at the same time, plaintiff seems to allege that Susan Mills of Quest had not yet transferred the urine sample to LabCorp during the period it was allegedly lost because she had not yet received the proper authorization from FDNY. (Compl. ¶144).

reported to plaintiff that there were insufficient quantities of DNA in the sample to develop a profile.[7]

Prior to the testing by LabCorp, plaintiff requested a so-called "Litigation Package" from B & S.[8]  Plaintiff made the request in writing through his attorney on both December 24, 2002 and January 30, 2003.  Receiving no response, plaintiff requested the assistance of Deputy Commissioner David Clinton in a letter dated February 26, 2003, and submitted another letter request to B & S on that same date.  By letter dated March 6, 2003, plaintiff, through his attorney, again requested the Deputy Commissioner's assistance in obtaining a Litigation Package from B & S.  Eventually, in late March, plaintiff received a letter from William Closson, Director of Forensic Toxicology at B & S, stating that he was prohibited by law from releasing the Litigation Package to anyone other than the "ordering

---

[7]In the letter, Anthony Winston, Associate Technical Director of Forensic Identity Testing at LabCorp stated:

> It is my opinion that the insufficient quantities of DNA obtained from this sample was possibly due to the sample not being thoroughly mixed prior to being aliquoted, the small volume of urine (8mls) and the samples long term storage conditions.  All could have affected the quality and quantity of DNA in this sample, but it is also possible that the sample simply did not contain sufficient cellular material to begin with.

(Compl., Exh. T.)

[8]A litigation package is apparently a collection of portions of the original specimen to be used in litigation when test results are in dispute. *Cf.* 49 C.F.R. § 40.365 (laboratory falsification, concealment or destruction of "documentation concerning any part of the drug testing process, including, but not limited to, documents in a 'litigation package'" are examples of serious noncompliance).

client/physician."[9]  (Compl., Exh. M).  Plaintiff allegedly never
received a Litigation Package from B & S, but received one from
Quest on April 1, 2003 after two previous requests in December
2002 and January 2003 were not responded to.  On April 14, 2003,
plaintiff filed his original complaint.


## Discussion

Plaintiff's remaining claims against the City of New York
arise under Title VII (race discrimination and retaliation),
Section 1981[10], Section 1983 (due process and equal protection)[11],
the Americans with Disabilities Act and Section 504 of the

---

[9] The letter was dated March 4, 2003, postage meter stamped March 15,
2003, and post marked March 18, 2003.

[10] Plaintiff asserts claims of racial discrimination under Title VII and
Section 1981 with respect to his signing the Stipulation and Agreement,
subsequent suspensions, failure to receive medical leave, and wrongful
termination.  *See* Memorandum and Opinion, Nov. 19, 2004, No. 03-CV-1797 (CPS),
p. 47; *see also* Plaintiff's Memorandum in Support of Motion for Summary
Judgment, p. 10 ("Mr. Thomas alleges in the EEOC Complaint that the defendant,
NYFD, engaged in impermissible retaliation in violation of Title VII which
resulted in suspension on more than one occasion and ultimately in termination
of his employment.")
     Plaintiff also asserts claims of hostile work environment and
retaliation under Title VII and Section 1981 in connection with the allegedly
degrading treatment inflicted on plaintiff by Captain Blume.  *See* Compl. ¶ 15
("That the workplace was hostile and the hostility was in retaliation for
plaintiff's filing an EEOC Charge of Discrimination sworn to on January 24,
2000 in which plaintiff alleged racially motivated discrimination.") and ¶ 53
(stating "[t]hat Captain Blume subjected plaintiff to disparate degrading,
humiliating and embarrassing treatment as set forth above" and that these acts
were Title VII and Section 1981 violations).

[11] Plaintiff's remaining Section 1983 claims are: (1) that the City
deprived him of his liberty interest without due process, (2) that the City
violated 40 C.F.R. Part 40 by publicizing his suspension from duty for the use
of a controlled substance, and (3) that the City violated his equal protection
rights by applying standards to his drug tests that were more strict than
those applied to other employees in safety-sensitive positions.

Rehabilitation Act[12], and Article 15 of the New York State Human Rights Law, New York Executive Law § 290 ("NYSHRL").[13] Plaintiff's remaining claim against defendant Dr. Kelly arises under 42 U.S.C. § 1981.

Plaintiff seeks reinstatement of his position, a permanent injunction ordering the City of New York to restore all benefits lost as a result of termination and to refrain from further retaliatory acts, and $25 million in compensatory damages from defendant City of New York. Plaintiff seeks $25 million in compensatory damages and punitive damages from Dr. Kelly. Plaintiff also seeks court costs and attorney's fees.


Summary Judgment Standard
_____

---

[12] Plaintiff alleges that he was discharged because of his disability, which he describes as his mixed anxiety and depressive disorders, for which his psychiatrist was prescribing Zoloft. *See* Memorandum and Opinion, Apr. 1, 2004, No. 03-CV-1797 (CPS), pp. 48-53.

[13] Section 296(a) of the New York Executive Law defines employment discrimination based on the "age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual" as unlawful, and § 296(e) forbids retaliation against employees who have complained of or opposed discriminatory practices.

In the November 14, 2004 decision, I dismissed plaintiff's state law claims of racial discrimination in connection with the suspensions imposed by Captain Blume, Captain Blume's harassment, and the Fire Department's denial of medical leave as time-barred. *See* Memorandum and Opinion, No. 03-CV-1797 (CPS), Nov. 19, 2004, p. 47. I did not dismiss plaintiff's state law claim in connection with his assertion that the Stipulation and Agreement itself was discriminatory because it imposed harsher conditions than allegedly similar agreements between the Fire Department and other firefighters. I determined that that claim was not time-barred because the date of accrual occurred "when [plaintiff] knew or had reason to know the allegedly discriminatory motive," *id*. at 50, which was after July 21, 1999, the date he entered the Stipulation and Agreement. *Id.*

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

Waiver of Claims in the Stipulation

Defendant City argues that it is entitled to summary judgment as a matter of law despite the numerous disputed factual issues relating to plaintiff's drug testing because plaintiff waived most of his claims when he entered into the Stipulation and Agreement to settle disciplinary charges on July 21, 1999. Paragraph 10 of the Stipulation and Agreement states that "the finding of the presence of alcohol, marijuana or any other controlled substance in [plaintiff's] blood or urine will be deemed to be a violation of this agreement." Stipulation and Agreement ¶ 10. Paragraph 14 provides in relevant part:

> [t]hat Firefighter Thomas understands that, for the entire duration of his employment with the Department, in the event of any violation of this agreement or any future misconduct relating to any conviction in a court of law, from the date of this stipulation, he will be terminated without a hearing of any kind, and Firefighter Thomas hereby waives any and all rights, including any right to a disciplinary hearing pursuant to Sections 75 and 76 of the Civil Service Law, Article 78 of the Civil Practice Law and Rules and any applicable collective bargaining agreement;

Stipulation and Agreement ¶ 14. Under Paragraph 19,

> this Stipulation constitutes a waiver by Firefighter Thomas whereby he is estopped from commencing or continuing any judicial or administrative proceedings or appeal, before any court of competent jurisdiction, administrative tribunal or Civil Service Commission, including but not limited to, actions pursuant to the Civil Rights Act of 1964 or any other Federal Civil Rights Statute, the Age Discrimination Employment Act of 1967, the Rehabilitation Act of 1973, or the Americans with Disabilities Act of 1990 and any applicable contractual grievance procedures, to contest the authority and jurisdiction of the Fire Department to impose the terms and conditions which are embodied in the Stipulation;

Stipulation and Agreement ¶ 19.  The Stipulation and Agreement

further provides

> [t]hat this Stipulation and Agreement has been entered into
> knowingly, intentionally, without coercion, duress or undue
> influence having been exerted upon Firefighter Thomas and
> has been accepted by Firefighter Thomas after having had
> discussions with, and having been advised thereon by, his
> counsel.

Stipulation and Agreement ¶ 22.

In my November 18, 2004 decision dismissing the Third

Amended Complaint, I affirmed my April 1, 2004 dismissal with

prejudice of plaintiff's procedural due process claim "[b]ecause

plaintiff explicitly waived his right to a pre- and/or post-

termination hearing" in paragraph 14 of the Stipulation and

Agreement and "made no allegations that he signed the Stipulation

under duress, coercion or without knowledge of the consequences."

Memorandum and Opinion, November 18, 2004, No. 03-CV-1797 (CPS),

p. 26.[14]

---

[14] In plaintiff's subsequent Third Amended Complaint, plaintiff asserts
new allegations with respect to the Stipulation.  Plaintiff asserts that "the
Deputy Commissioner of Legal Affairs forced plaintiff to sign a Stipulation
Agreement by asserting that plaintiff would be fired if he failed to sign."
Complaint ¶ 27.  Plaintiff also alleges that he signed the Stipulation
"without the benefit of legal representation" and "while under a doctor's care
and treatment and while under the influence of Zoloft, a prescribed
antidepressant."  Complaint ¶¶ 31-32.
    In my November 19, 2004 decision, I reaffirmed my decision dismissing
with prejudice plaintiff's procedural due process claims, relying on the law
of the case doctrine, which "posits that when a court decides upon a rule of
law, that decision should continue to govern the same issues in subsequent
stages of the same case."  Memorandum and Opinion, No. 03-CV-1797 (CPS), Nov.
19, 2004, p. 27 (citing *DiLaura, et. al. v. Power Authority of the State of
New York*, 982 F.2d 73, 76 (2d Cir. 1992); *Liona Corp. v. PCH Assocs.*, 949 F.2d
585, 592 (2d Cir. 1991).  The doctrine is discretionary, though the Second
Circuit has noted that "the major grounds justifying reconsideration are an
intervening change of controlling law, the availability of new evidence, or
the need to correct a clear error or prevent manifest injustice."  *Virgin*

Defendant City of New York now moves for dismissal of plaintiff's Title VII, Rehabilitation Act, Americans with Disabilities Act, Sections 1981 and 1983, and New York State Human Rights Law claims based on the waiver contained in the Stipulation and Agreement.  Just as "[i]t is well settled that a public employee may waive his procedural due process protections," Memorandum and Opinion, No. 03-CV-1797 (CPS), April 1, 2004, p. 29 ("April 2004 Memorandum") (citing *inter alia Miller v. Coughlin*, 59 N.Y.2d 490, 494 (1983)), "[j]udicial acceptance of compromises in which the most fundamental of rights are waived is not uncommon." *David Abramovich v. Bd. of Educ. Of Central School District*, 46 N.Y.2d 450, 456 (Ct. App. 1979) (also stating that "the comprehensive range of matters on which agreements between litigants or potential litigants is enforceable long ago came to include 'stipulating away statutory, and even constitutional rights.'") (citations omitted).  "A party may by contract waive his right to resort to the courts, but he will only be held to have done so if the waiver is explicit." *Security and Law Enforcement Employees, District Council 82, AFSCME, AFL-CIO v. Hartnett*, 500 N.Y.S.2d 571, 572 (Sup. Ct. 1986).  The waiver must be "freely, knowingly and openly arrived

---

*Atlantic Airways v. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir. 1992).  Because no such ground existed, I did not reconsider plaintiff's procedural due process claim.

at, without taint of coercion or duress." *Montiel v. Kiley*, 538 N.Y.S.2d 2, 4-5 (1989), *quoted in* April 2004 Memorandum, p. 29.

Plaintiff seeks to avoid the effect of the Stipulation by arguing that "plaintiff would be fired if he did not sign the [Stipulation]," Plaintiff's Opposition Memorandum, p. 3; *see also* Plaintiff's Reply Memorandum, p. 3, and that he was not represented by counsel at the time he signed the document. *Id.* These arguments do not present a case of coercion or duress sufficient to overcome the bargain struck in the Stipulation. As stated in my April 1, 2004 decision, "the waiver is valid where it 'serves as the quid pro quo for countervailing benefits.'" Memorandum and Opinion, April 1, 2004, No. 03-CV-1797 (CPS), p. 30 (quoting *Abramovich*, 46 N.Y.2d at 455). "[I]n return for signing the Stipulation, plaintiff was able to retain his position as an employee of the FDNY." Memorandum and Opinion, April 1, 2004, No. 03-CV-1797 (CPS), p. 30. Moreover, contrary to his current assertion that he did not have legal representation at the time he signed the document, plaintiff averred that he had been advised by counsel in Paragraph 22 of the Stipulation. *See Morrisroe v. Safir*, 1998 WL 709822, at *1 (S.D.N.Y. 1998)("The plea document shows that plaintiff was represented by counsel during the disciplinary proceedings. Plaintiff signed the document and acknowledged that he had discussed the plea and its 'ramifications' with his attorney.").

Plaintiff's deposition testimony likewise reveals that he understood the terms of the Stipulation.[15]  *See Abramovich*, 46 N.Y.2d at 457-58 (dismissing claims based on petitioner's stipulation in part because "even now, from the vantage point of hindsight, petitioner does not seriously controvert his acceptance and understanding of the terms of the stipulation"). Because the waiver of rights in the Stipulation is explicit and without coercion, plaintiff is bound by its terms.  Accordingly, with the exception of plaintiff's Title VII and Section 1981 claims regarding hostile work environment and retaliation[16], plaintiff's claims against defendant City of New York under Title VII of the Civil Rights Act, the Rehabilitation Act, the Americans with Disabilities Act, Sections  1981 and 1983, and his

---

[15] Plaintiff stated in his deposition that when he signed the Stipulation,

> I waived all my civil rights and all my constitutional rights . . . I had no rights to appeal.  I had no rights to go to court.  I had no rights – well, I waived the right to appeal, waived the right to go to court, waived the right to the disability act and a number of other different things that were waived.  And these are all the things that are given to you by the Constitution of the United States that was stripped from me by the fire department when they forced me to sign the stipulation . . . .

Defendants' Exhibit BB, Deposition Testimony of Claude Thomas, 12:15-16 and 13:3-11.

[16] These claims are not covered by the terms of the Stipulation and Agreement, which are limited to claims arising from plaintiff's agreement to submit to random drug testing procedures and to avoid other criminal misconduct.

New York State Human Rights Law claim must be dismissed in accordance with the Stipulation and Agreement.[17]

*Hostile Work Environment and Retaliation*[18]

The Supreme Court has interpreted Title VII to prohibit "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). To succeed on a hostile work environment claim, a plaintiff must show, first, that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id*. at 21. Factors to be considered in determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[17] In any event, since plaintiff "provides no argument" concerning his federal disability claims, his age and disability discrimination claims under the New York State Human Rights Law, or his claim against Dr. Kelly, those claims are considered abandoned. *See Blouin ex rel. Estate of Pouliot*, 356 F.3d 348, 363 n. 9 (2d Cir. 2004) (deeming plaintiff's claims abandoned because "[a]lthough mentioning [those] claims, [plaintiff] provides no argument concerning them") (citing *Taylor v. Rodriguez*, 238 F.3d 188, 196-97 (2d Cir. 2001)); *Lipton v. County of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y. 2005) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

[18] "[M]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 and the Equal Protection Clause." *Tilghman v. Waterbury Bd. of Educ.*, 154 Fed.Appx. 221, 223 (2d Cir. 2005) (citations omitted). Accordingly, plaintiff's claims of hostile work environment and retaliation under Title VII and Section 1981 are considered together.

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Although "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred," they must occur under circumstances under which "the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Svenningsen v. College of Staten Island*, No. 01-CV-7550, 2003 WL 21143076, *2 (E.D.N.Y. 2003); *see Gregory v. Daly*, 243 F.3d 687, 694-695 (2d Cir. 2001). Isolated incidents of offensive conduct are generally inadequate to establish a discrimination claim, and plaintiff must show "either a single incident was extraordinarily severe, or that a series of incidents was sufficiently continuous and concerted" to cause a change in the work environment. *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000)(citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). "[A]lleged epithets and demeaning invective directed at a plaintiff by his or her superiors or co-workers can, if believed by a factfinder, subject an employer to legal liability for discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 373 (2d Cir. 2003). However, the plaintiff must demonstrate that the conduct occurred because of, not incidental to, the protected trait or characteristic. *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). "For

racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (internal quotation marks and citations omitted). "Thus, whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Id.* at 110-11 (internal quotation marks and citations omitted), *cited in Kemp v. A & J Produce Corp.*, 164 Fed.Appx. 12, at *14, 2005 WL 3310063, at *1 (2d Cir. 2005).

After establishing that a hostile work environment resulting from discrimination existed, a plaintiff must show that there is a specific basis for imputing the discriminatory conduct to his employer. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996).

Plaintiff alleges two incidents of abusive conduct in the workplace. The first incident allegedly occurred on November 15, 1999, when Captain Blume, allegedly angry that plaintiff did not move quickly enough when ordered upstairs, placed his index finger on plaintiff's cheek and screamed, "Mother f . . . .er, who do you think you are? When I give you a f . . . ing order,

you better listen boy, you f . . .ing a . . hole." Comp. ¶ 42.

Captain Blume suspended plaintiff for 30 days and said to

plaintiff as plaintiff changed into civilian clothes, "we got you

nigger." Comp. ¶¶ 48-49. The second incident occurred when

Captain Blume suspended plaintiff for 30 days immediately after

his return to work from his earlier suspension for allegedly not

turning the volume down on the television quickly enough when

ordered to do so. Plaintiff suffered severe chest pains as a

result of the confrontation and was taken to a hospital by

Emergency Medical Services. Comp. ¶ 52.

Plaintiff alleges no other incidents after 1999 or with any

other supervisor that fostered a hostile work environment. Taken

together, no reasonable juror could infer that these incidents

were severe or pervasive enough to create a hostile work

environment. Accordingly, plaintiff's claims for hostile work

environment and retaliation are dismissed.[19]

## Conclusion

---

[19] With respect to plaintiff's retaliation claim, plaintiff asserts that
the allegedly hostile work environment "was in retaliation for plaintiff's
filing an EEOC Charge of Discrimination sworn to on January 24, 2000 in which
plaintiff alleged racially motivated discrimination." Compl. ¶ 15. Because
there was no hostile work environment claim, the retaliation claim fails, but,
in any event, this claim must be dismissed simply because the allegedly
hostile work environment, namely Captain Blume's mistreatment of plaintiff in
late 1999, occurred *before* plaintiff filed the EEOC claim which allegedly
prompted the retaliation.

For the foregoing reasons, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted.  Plaintiff's claims under Title VII, Sections 1981 and 1983, the ADA and the Rehabilitation Act, and the NYSHRL are dismissed.

The clerk is directed to enter judgment dismissing the complaint in its entirety and to transmit a copy of the within to the parties and to the magistrate judge.


        SO ORDERED.

Dated:    Brooklyn, New York
          July 24, 2007


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge